UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID BROWNING, et al.,

        Plaintiffs,

    v.

AMYRIS, INC., et al.,

        Defendants.

Case No. 13-cv-02209-WHO

**ORDER GRANTING MOTION TO DISMISS**

Re:  Dkt. No. 39

     In this putative securities class action, the plaintiffs allege that defendants Amyris, Inc., and its chief executive officer, John G. Melo, knowingly made false and misleading statements about the production levels of Biofene, the chemical product Amyris makes.  The question I need to decide on this motion to dismiss is whether or not the challenged statements are accurate, fall under a safe-harbor, or were made with a culpable state of mind.  Because the plaintiffs fail to plead the existence of any false or misleading statement and scienter with particularity, I GRANT the motion to dismiss with leave to amend.

**FACTUAL BACKGROUND**

**I.**    **BACKGROUND ON AMYRIS**

     Amyris describes itself as "building an integrated renewable products company to provide sustainable alternatives to a broad range of petroleum sourced products used in specialty chemical and transportation fuel markets worldwide . . . by applying [its] industrial synthetic biology technology platform to modify microorganisms, primarily yeast, to function as living factories in established fermentation processes to convert plant-sourced sugars into a variety of hydrocarbon molecules that can serve as[ ] flexible building blocks to be used in a wide range of products." Compl. ¶ 3(a).  Its priority was to produce and sell farnesene, a chemical compound, and its

1    derivatives in a range of specialty chemical applications in markets such as cosmetics, lubricants,

2    flavors and fragrances, polymers, consumer products, and transportation fuel.  Compl. ¶ 3(b).

3    Melo was Amyris's president and chief executive officer during the class period.  Compl. ¶ 4.

4         Amyris's "technological foundation" started in 2001 when Jay Keasling, a professor at the

5    University of California, Berkeley, and his research team created a method to produce isopentenyl

6    pyrophosphate, a chemical precursor to farnesene with commercial potential.  *See* Compl. ¶ 11.

7    Keasling filed for a patent in 2001, and Amyris was formed in 2006.  Compl. ¶ 13.  Though the

8    company was originally developing synthetic artemisinin, which is used as an anti-malarial drug,

9    the Amyris team was able to replace a single enzyme in the production of artemisinin and convert

10   the end product from artemisinin to farnesene.  Compl. ¶¶ 14-15.  Amyris branded its farnesene

11   product "Biofene."  Compl. ¶ 19.

12        Amyris uses microorganisms, primarily yeast, to convert plant sugars into farnesene.

13   Compl. ¶¶ 19, 22.  The plaintiffs claim that "there is a significant difference between performing

14   this process in the laboratory in small batches, and doing so on a scale large enough to be

15   commercially viable."  Compl. ¶ 25.  In order to create Biofene on a scale large enough that

16   Biofene could be sold cheaply to compete with oil, Amyris formed joint ventures with existing

17   chemical producers to use their production facilities.  Compl. ¶ 26.

18        In April 2010, Amyris's board decided to take the company public, anticipating that

19   farnesene could compete on price with petroleum.  Compl. ¶ 16.  On September 17, 2010, one

20   industry publication noted concerns about technical challenges facing Amyris, particularly the

21   ability to produce farnesene at levels for commercial sale.  *See* Compl. ¶ 17.  The plaintiffs allege

22   that "[b]ecause of these concerns, Amyris management knew that in order for their public offering

23   to be successful they would have to present a viable path to commercially feasible Biofene in a

24   short period of time."  Compl. ¶ 18.  According to an August 8, 2010, article, during a 2010

25   "roadshow" prior to the initial public offering, Melo showed charts contrasting rising fuel prices

26   with falling sugar cane prices and told potential investors that by 2011, Amyris would produce six

27   to nine million liters of farnesene, and another 40 to 50 million liters by 2012.  Compl. ¶ 18.

28        On February 22, 2011, Amyris issued a press release stating that it had successfully

United States District Court
Northern District of California

2

"completed multiple runs of its fermentation process using Amyris engineered yeast to produce Biofene™, Amyris renewable farnesene, in 100,000 and 200,000 liter capacity fermentors." Compl. ¶ 28 (quoting Press Release, Amyris Technology Performs Successfully at Industrial Scale (Feb. 22, 2011)).  Another press release stated that "Amyris has entered into agreements for the production of farnesene at a facility of Biomin . . . and Tate & Lyle . . . ."[1]  Compl. ¶ 28 (quoting Press Release, Amyris Expands Processing & Finishing Production Capabilities (Jan. 4, 2011)). "Both before and after that announcement, Amyris announced that it had entered into joint venture agreements with various other entities to utilize its biofuels."  Compl. ¶ 28.

## II.    ALLEGED MISSTATEMENTS

On April 29, 2011, Amyris announced the completion and operation of a plant in Brazil, its first industrial-scale facility for Biofene production.[2]  Amyris issued a press release stating,

> Amyris will operate the production facility and expects to begin Biofene production in May. . . . To achieve production at full industrial scale, Amyris has developed an integrated scale-up process which connects ongoing advances in Amyris research with industrial-scale production.  By miniaturizing process conditions found in production-scale fermentors, Amyris has been able to translate yeast performance successfully from discovery to production.

Compl. ¶ 58 (quoting Press Release, Amyris's First Production Facility Commissioned (Apr. 29, 2011)).  The press release quotes Melo as saying, "With this milestone, we are demonstrating that engineered yeast may be used to produce high-value hydrocarbon molecules on a commercial scale."  Compl. ¶ 58.

Plaintiffs allege that these statements were untrue.  According to a confidential witness ("CW") who was a senior scientist at Amyris, the management's projections completely ignored the possibility of complications in starting up and operating Amyris's facilities, especially its key facility in Brazil.  Compl. ¶ 45.  In May 2011, none of Amyris's Biofene production facilities were fully operational and had technical problems, especially the Brazil plant.  Compl. ¶¶ 46, 64(a).  At that time, Amyris had conducted only two or three test runs of the production process throughout

---

[1] These appear to be chemical producers.  *See* Compl. ¶ 58.
[2] Amyris's plant is located on a facility owned by Biomin do Brasil Nutricão Animal Ltda., an animal-nutrition company.  Compl. ¶ 58.

its labs, only one of which occurred at the Brazil plant.  Compl. ¶¶ 47, 64(b).  According to the CW, "during the Class Period," Amyris knew that the Brazil plant was poorly designed and constructed, and it needed to be retrofitted to prevent contamination.  Compl. ¶¶ 48, 64(c).  Also "[d]uring the Class Period," Amyris knew that roughly 70 to 80 percent of the production runs at the Brazil plant failed.  Compl. ¶¶ 49, 64(d), 66.

On May 5, 2011, during a quarterly earnings call with analysts, the defendants "reinforced investors' perceptions that Amyris could produce Biofene in commercial quantities."  Compl. ¶ 59.  On the call, Melo stated,

> Our technical achievements and construction advances reinforced our outlook for production cost and volume. . . . Together, we expect these 5 facilities to produce about 200 million liters at target production efficiency.  And we believe that the demand potential represented by our distribution partners and current off-take agreements is over $1 billion in annual sales by 2013.  Further, we expect to add to this portfolio of off-take agreements substantially during the remainder of this year, with active discussions underway with customers representing an additional $400 million to $600 million in annual revenue potential. . . . Our technology, including yield continues to advance.  Yield is one of the technical metrics driving a reduction in product costs. . . . Our production outlook remains the same as in the previous guidance we provided - 6 million to 9 million liters of Biofene this year, and 40 million to 50 million liters in 2012 . . . .

Compl. ¶ 59 (quoting Q1 2011 Amyris Inc. Earnings Conference Call – Final (May 5, 2011)).

According to the CW, this was all materially false and misleading because Amyris failed to disclose that in order for it to even come close to achieving the six to nine million liter projections for 2011, Amyris would have needed a significant number of factors to go as well or better than they theoretically could.  Compl. ¶ 65(a)-(b).  Amyris's scientists' projection was actually five-fold lower than the public projections—a concern that the CW voiced to the Vice President of Engineering at some point.  Compl. ¶¶ 31, 65(c).

On August 2, 2011, during another quarterly earnings call with analysts, Melo again "touted Amyris'[s] commercial production capabilities during a second quarter earnings call with analysts," stating,

> We delivered on commercial production, customer expansion and a step-up opportunity for our diesel business.  We have commercial production underway at Biomin and Antibióticos, chemical finishing at Glycotech and in Brazil, and construction at Paraíso and São Martinho, Amyris' joint venture, remains on schedule. . . . First, our first commercial plant in Biomin has started up and is producing farnesene.  In our first month

4

of production we delivered 99% of our target production volume and are ramping up quickly. Our initial start-up went well and without surprises.  Our yeast, our processes and our equipment performed as expected. . . . Beyond Biomin, we have now started operations at our second plant in Spain, Antibióticos, and that is also going well.  Our third plant, at Tate & Lyle, is nearing completion and should be commissioned this month. . . . [W]e expect to be operating this quarter at three fermentation production facilities on three continents with three feedstock sources.  We expect these three CMOs to produce at a 30-million-liter run rate by the end of 2011, and for our five production facilities together to produce over 200 million liters a year, once we achieve target production efficiency.

Compl. ¶ 60 (quoting Q2 2011 Amyris Inc. Earnings Conference Call – Final (Aug. 2, 2011)).

When asked what were "some of the biggest lessons learned so far," Melo responded,

The biggest lessons learn[ed] are [that] operating in a production plant is different than operating in a demo plant. . . . [E]ven with all that knowledge and all that experience [gained from operating in a demonstration facility], when you go production, it's not exactly the same. . . . Where we have one standard operating procedure written, that procedure may not be the same procedure required for every single condition.  And because this is our first large-scale production facility, we are learning those conditions, and we are having to adapt and change the standard operating procedures to match the conditions in an operating environment.  So I'd say lots of small things, no big a-hah and a lot it [sic] just about basic operating practices at the site.

Compl. ¶ 61 (quoting Q2 2011 Amyris Inc. Earnings Conference Call – Final (Aug. 2, 2011)).

The plaintiffs allege that all these statements "were materially false and misleading when made.  In fact, Defendants' method of 'scaling-up' their production to commercial levels was at that time[ ] completely unsuccessful, and the representations about expected production capacities, run rates, and similar metrics material to investors, had no basis in fact."  Compl. ¶ 62.  The same is true regarding the defendants' statements regarding the Biomin facility's operations and projections.  Compl. ¶ 63.  While Amyris was still touting its ability to commercially produce Biofene, Amyris hired Andrew Russell, an independent bio-consultant, to evaluate issues at the plant because Amyris "could not fix" it.  Compl. ¶ 50.  Russell's report was circulated within Amyris around October 2011.  Compl. ¶ 51.

In November 2011, Amyris began to publicly acknowledge that it was unlikely to reach its 2012 projections.  Compl. ¶ 52.  On November 1, 2011, the defendants held an earnings call for the third quarter of 2011.  On that call, Melo stated,

There's nothing like actually running a commercial-scale plant to achieve true clarity and understanding on what works and what needs to be improved.  That has been the case with us this past quarter. . . . We have learned how to improve deployment regarding our team

> and capabilities, automation and equipment redundancy. . . . To give ourselves space from the learnings to implement these changes and underpin our production for the ramp into next year, we decided to slow down our production ramp this year to produce a total of 1 million to 2 million liters of farnesene and achieve a year-end run rate in the range of 700,000 liters of production a month.

Compl. ¶ 67 (quoting Q3 2011 Amyris Inc. Earnings Conference Call – Final (Nov. 1, 2011)). Based on this news, Amyris's stock price dropped nearly 20 percent, from $19.36 on November 1, 2011, to $15.47 on November 2, 2011, on "unusually heavy trading volume." Compl. ¶ 68. The price continued falling to $14.05 by November 4, 2011. Compl. ¶ 68.

Despite this drop in the stock price, Amyris's stock continued to trade at artificially inflated prices because Defendant Melo assured investors during the conference call that the Company 'ha[d] successfully addressed some of the earlier shortcomings' and 'have had a very successful experience at Biomin with these corrective measures in place.'" Compl. ¶ 69. In particular, Melo stated,

> We recently ran the fermentation operation continuously for over 570 hours; something our internal experts tell us is a rare accomplishment for the fermentation industry as a whole, so, we are very proud of this achievement. Antibióticos achieved stable operation several weeks ago. And we are currently engaged in optimizing our processes further to drive further production efficiencies. After several months longer than planned, we are pleased with having stabilized our production across our facilities.

Compl. ¶ 69 (quoting Q3 2011 Amyris Inc. Earnings Conference Call – Final (Nov. 1, 2011)).

## III.   CONFIDENTIAL WITNESS

The CW says that Amyris knew much earlier than November 2011 that there was no possibility of meeting the original projections, and its scientists wondered why Amyris was taking so long to say so. Compl. ¶ 53. "At one point during the Class Period, the Brazil plant had shut down, the Tate & Lyle plant would not be operating until November 2011, and the only facility running was in Spain, which did not start until August 2011." Compl. ¶ 54.

The "CW believes that [Amyris]'s management was aware that it would not be able to translate peak yields of Biofene, produced in lab settings, to stable and reliable production at factory scale." Compl. ¶ 32. The CW believes that Melo and Amyris's management "either completely ignored its scientists' realistic recommendations concerning projections of yield, or cherry picked the very best available data from tests at every step of the process, then accelerated

United States District Court
Northern District of California

that data based on knowingly unrealistic projections . . . to create numbers for the projected yield that they disclosed to investors." Compl. ¶ 34.

The CW states that Amyris's 2011 projects of six to nine million liters in production were beyond what existing technology could make. *See* Compl. ¶ 35. He says that while Amyris's ability to turn sugar into farnesene as of April 2011 was "improving gradually," Amyris's projections would have required a rapid increase "not consistent with past performance." Compl. ¶ 36. Amyris maintained a "publishing database," which contained the results of all internal experiments and tests performed by Amyris scientists, and the data showed that Amyris could not reach its 2011 and 2012 projections even in a "best case scenario." Compl. ¶¶ 37-38. Amyris's Vice President of Engineering, who reported to Amyris's board and Melo, "had unfettered access to this database." Compl. ¶ 39. But management "regularly 'grabbed and used' any high yield results from small run tests as proof" of Amyris's technological abilities. Compl. ¶ 40. These tests, however, often involved single experience in which "any number of factors could provide an anomalous result that management knew was not indicative of [Amyris]'s actual ability to produce Biofene on a large scale." Compl. ¶ 41.

The CW claims that many scientists, including him, voiced concerns to the Vice President of Engineering about Amyris's ability to increase production and meet its projections, but the environment and specific incidents at Amyris showed that the management did not want scientists to question yield numbers that the company was publicly touting. Compl. ¶ 43. One employee who drafted an unfavorable cost model for Biofene was "pushed out." Compl. ¶ 44.

## IV.   POST-CLASS PERIOD STATEMENTS

In July 2013, after the class period, Amyris allegedly admits in a video it produced that its earlier projections were unattainable and stated that it is only now "optimizing their first generation sugar conversion processes," and that "[t]here are still many steps to make before getting there, [b]ut large-scale conversion of biomass into renewable energy is underway." Compl. ¶ 77 (citation omitted).

The plaintiffs retained consultants who reviewed the complaint, Amyris's public filings and statements, "and the appropriate technical literature in the relevant fields." Compl. ¶ 74.

United States District Court
Northern District of California

7

1    They opine that the barriers to entry for biotechnological production are "vast and mostly too wide

2    for start-up or development stage companies.  Amyris could not have reasonably expected to

3    overcome these hurdles and expand production to the levels it projected."  Compl. ¶ 74.  "Large

4    scale fuel processing" was not a feasible objective for the defendants' technology.  Compl. ¶ 75.

5           Based on other statements in the video, the plaintiffs' consultants claim that an air filtration

6    method used by Amyris could allow contamination and that a consultant retained by Amyris, who

7    is an expert in air filtration in pharmaceutical operations, "would likely have reached the same

8    conclusions [the plaintiffs' consultants] have regarding contaminations."  Compl. ¶ 79.  The

9    consultants "believe" that Amyris's production violated "standard chemical engineering rules"

10   and, "based on what was known at the time, Amyris'[s] projections were unreasonable."  Compl.

11   ¶ 80.  According to the consultants, Amyris "could not have reasonably believed it would meet its

12   projected levels of biofuel production at the time and therefore made misleading statements" for

13   three reasons:  (i) midjudgment of scale from lab operations to full scale commercial production in

14   an environment which ignored concerns raised by staff and consultants; (ii) failure to

15   communicate and manage the necessary barriers of entry in full scale production due to

16   disconnects between lab scientists and chemical engineering despite warnings; and (iii) failure

17   to reasonably project production, which exceeded the appropriate scale.  Compl. ¶ 81.

18          On February 9, 2012, the defendants held a "Business Update" call with analysts, during

19   which Melo stated that Amyris no longer planned to complete expansion of one of its 100 million

20   liter plants.  Compl. ¶ 82.  In particular, he said,

21       For 2012, we are centering our activities around improving the stability and predictability
22       of our operations in order to build sustainable, long-term value.  Our experience over the
         past months provides us with greater understanding about new plant operations.  We show,
23       conclusively that our technology does work at scale, but also learned that it takes time to
         translate from peak yield levels in the lab to maintaining those yields over longer
24       operational periods in the field. . . . [W]e are focusing on operational quality versus
         production quantity.  We need to retain flexibility in how we optimize between production
25       volume, cost, customer demand, and cash, rather than driving to deliver a pre determined
         production volume. . . . These decisions will, of course, impact our 2012 production and
26       cash outlook. Given the lower plant volume, we are no longer adhering to our previously
         announced plan to produce 40 million liters to 50 million liters of Biofene in 2012.
27       Second, we are no longer forecasting positive cash flow from operations in 2012.  To cover
         this gap, we are raising additional equity financing. . . . Biomin, we had a significant
28

United States District Court
Northern District of California

number of operational issues through . . . 2011.  We ended December with stable
operations at Biomin.

Compl. ¶ 83 (quoting Amyris Inc. Investor Update Conference Call - Final (Feb. 9, 2012)).  Due

to this news, Amyris's stock price fell from a $9.73 per share on February 9, 2012, to $6.99 on

February 10, 2012, on unusually heavy trading volume.  Compl. ¶ 84.  An analyst report by J.P.

Morgan explained,

> We reduced our December 2012 price target for Amyris from $19 to $6 reflecting our
> negative earnings revisions due to the delay of projects and uncertain product yields.  In
> addition, there have been substantial reductions in the valuation of bio-based materials
> companies across the board. . . . We do not believe that the valuation of the company is
> poised to appreciate without meaningful improvements in yield and substantial production
> in Brazil that is unlikely to take place until 2013.

Compl. ¶ 85.

The plaintiffs allege that the defendants knew they would need to set goals at commercially

feasible levels in order to complete the IPO and maintain the share price, but had no reasonable

basis to do so; any admission that they could not meet those goals would cause Amyris to lose

credibility and cause the price of shares to plummet, so they continued to support those

increasingly unrealistic projections and hide the true state of affairs.  Compl. ¶ 86.  An August 8,

2012, article described Amyris's projections as "the tragic misstep of Amyris's young and

turbulent life."  Compl. ¶ 87.  In the article, Amyris's chief technology officer, Neil Renninger,

stated that Amyris was "chasing that number" projected by Melo; otherwise, it would lose

credibility.  The article also states that Melo saw those volumes as "laughably small," but

describes this as "a failure of comprehension."  Compl. ¶ 87.  "The regret is not realizing how hard

it was to get the scale up," Melo said.  Compl. ¶ 87.

## V.   OTHER ALLEGATIONS OF SCIENTER

The plaintiffs allege that the defendants "acted with scienter in that they knew that the

public written and oral statements issued or disseminated in the name of [Amyris] were materially

false and misleading; knew that such statements would be issued or disseminated to the investing

public; and knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements as primary violations of the federal securities laws."  Compl.

¶ 89.  Melo was "aware of the actual state of data regarding projections for production yield, yet

United States District Court
Northern District of California

9

1   continued to make materially false and misleading statements, in continuance of th[is] fraudulent

2   scheme."  Compl. ¶ 90.  The defendants knew that any failure to meet the projections Melo made

3   would cause an immediate fall in stock price.  Compl. ¶ 91.  They were motivated to engage in

4   this "fraudulent scheme" so that could sell their own stock at "artificially inflated prices."  Compl.

5   ¶ 92.  Before the value of Amyris' securities collapsed, Melo sold 147,170 shares of common

6   stock worth $3,347,953.15, and, as a group, Amyris "insiders" sold over 540,000 shares for over

7   $13 million.  Compl. ¶ 92.

8           The defendants made a series of materially false or misleading statements and omissions

9   about Amyris's conditions which created an unrealistically positive assessment of Amyris and

10  caused its stock price to be artificially inflated.  Compl. ¶ 99.  When Amyris's true condition was

11  revealed, its stock price declined substantially, resulting in significant damages to its shareholders.

12  Compl. ¶ 99.  If they had known the truth earlier, the plaintiffs would not have purchased

13  Amyris's stock.  Compl. ¶ 100.  "Many" of the statements the defendant made were not identified

14  as "forward-looking statements," but to the extent they were, they were either knowingly false or

15  there was "no meaningful cautionary statements identifying important factors that could cause

16  actual results to differ materially from those in the purportedly forward-looking statements."

17  Compl. ¶ 105.

18  **VI.     FACTS IN REQUEST FOR JUDICIAL NOTICE[3]**

19          In its Form S-1 Registration Statement with the Securities and Exchange Commission

20  ("SEC"), filed April 16, 2010, Amyris stated that it was "subject to the substantial risk of failure

21  facing businesses seeking to develop products based on a new technology."  Ehrlich Decl. Ex. I at

22  15.  It stated that "[c]ertain factors that could, alone or in combination, prevent [Amyris] from

23  successfully commercializing [its] renewable products include":  issues with yield, *id.* at 15;

24  contamination, *id.*; complete lack of experience producing products at commercial scale, *id.*;

25  ────────────────

26  [3] The defendants made a request for judicial notice of its earnings call transcripts, a press release,
    and various filings with the Securities and Exchange Commission ("SEC").  Dkt. No. 40.  Because
    these materials are appropriate for judicial notice, the plaintiffs referenced them in their complaint,

27  and the plaintiffs do not object to judicial notice, the request is GRANTED.  *See, e.g., Rosenbaum
    Capital, LLC v. McNulty*, 549 F. Supp. 2d 1185, 1189-90 (N.D. Cal. 2008) (taking judicial notice

28  of press releases and call transcripts referenced in complaint and SEC filings).

1    potential issues with production processes at new facilities, including technical and operational

2    challenges, *id.* at 15-21; risks related to operating facilities in Brazil and uncertain supplies of

3    power and other inputs, *id.* at 16-21; and the risks associated with attempting to compete against

4    established companies, *id.* at 24-25.  Amyris repeated these warnings in its 2010 annual 10-K

5    report filed with the SEC, as well as its 2011 Q1, Q2, and Q3 quarterly 10-Q reports.  *See* Ehrlich

6    Decl. Exs. E-H.

7         Before each of the analyst calls discussed in the complaint, Head of Investor Relations

8    Erica Mannion would begin by stating, "On the call today, we'll provide certain forward-looking

9    statements about events and circumstances that have not yet occurred.  Actual outcomes and

10   results may differ materially from those contained in these statements due to a number of risks and

11   uncertainties, including those provided in the company's recent SEC filings . . . ."  Ehrlich Decl.

12   Ex. A (Q1 2011 Earnings Call) at 1; Ehrlich Decl. Ex. B (Q2 2011 Earnings Call) at 1; Ehrlich

13   Decl. Ex. Ex. C (Q3 2011 Earnings Call) at 1.

14        In its 2010 10-K filing, filed March 14, 2011, Amyris stated, "We have no experience

15   producing our products at the commercial scale needed for the development of our business, and

16   we will not succeed if we cannot effectively scale our technology and processes."  Ehrlich Decl.

17   Ex. E at 20.  In addition, "our ability to produce the volume of Biofene covered by our existing

18   agreements and letters of intent is based on our achieving substantially higher production

19   efficiencies than we have to date.  We may never achieve those production efficiencies."  *Id.*

20                              **PROCEDURAL HISTORY**

21        Plaintiffs David Browning and Steven Tsao seek to represent a class of all persons who

22   acquired the securities of Amyris from April 29, 2011, to February 8, 2012 (the "class period").

23   The complaint asserts:  (1) violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and

24   Rule 10b-5, 17 C.F.R. § 240.10b-5, and (2) violation of Section 20(a) of the Exchange Act, 15

25   U.S.C. § 78t(a).  Dkt. No. 31.  I heard argument on the motion to dismiss on March 19, 2014.

26

27

28

United States District Court
Northern District of California

11

**LEGAL STANDARD**

**I.   FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In considering whether the complaint is sufficient to state a claim, the court accepts as true all of the factual allegations contained in the complaint. *See id.* However, the court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citation omitted).

**II.   PLEADING REQUIREMENTS IN SECURITIES FRAUD ACTIONS**

Section 10(b) of the Exchange Act makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe[.]" 15 U.S.C. § 78j(b). SEC Rule 10b-5, promulgated under the authority of Section 10(b), in turn, provides that "[i]t shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

The basic elements of a Rule 10b-5 claim are: (i) a material misrepresentation or omission of fact, (ii) scienter, (iii) a connection with the purchase or sale of a security, (iv) transaction and loss causation, and (v) economic loss. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005)

United States District Court
Northern District of California

1    (citation omitted).  A statement or omission is misleading regarding a material fact when there is

2    "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the

3    reasonable investor as having significantly altered the 'total mix' of information made available."

4    *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citation omitted).  "Scienter may be

5    established . . . by showing that the defendants knew their statements were false, or by showing

6    that defendants were reckless as to the truth or falsity of their statements."  *Gebhart v. S.E.C.*, 595

7    F.3d 1034, 1041 (9th Cir. 2010).

8           In order to establish a prima facie case under Section 20(a), a plaintiff must prove:  (i) a

9    primary violation of federal securities laws; and (ii) that the defendant exercised actual power or

10   control over the primary violator.  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir.

11   2000).  "Whether [a defendant] is a controlling person 'is an intensely factual question,' involving

12   scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the

13   defendant's power to control corporate actions."  *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir.

14   1994) (citation omitted).  A director or CEO "is not automatically liable as a controlling person."

15   *Id.*; *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996).  "Section

16   20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary

17   violation of section 10(b)."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir.

18   2009).

19   **III.     FEDERAL RULE OF CIVIL PROCEDURE 9(b) AND THE PSLRA**

20          Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), securities fraud

21   claims must "plead with particularity both falsity and scienter."  *Ronconi v. Larkin*, 253 F.3d 423,

22   429 (9th Cir. 2001).  This is the same standard under Federal Rule of Civil Procedure 9(b).  With

23   respect to falsity, "the complaint must specify each statement alleged to have been misleading,

24   [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  With

25   respect to scienter, "the complaint shall, with respect to each act or omission alleged . . . state with

26   particularity facts giving rise to a strong inference that the defendant acted with the required state

27   of mind."  15 U.S.C. § 78u-4(b)(2).  "[F]alsity and scienter in private securities fraud cases are

28   generally strongly inferred from the same set of facts, and the two requirements may be combined

United States District Court
Northern District of California

13

1  into a unitary inquiry under the PSLRA." *In re Daou Sys.*, 411 F.3d at 1015 (citation and internal

2  quotation marks omitted).

3      "To adequately demonstrate that the defendant acted with the required state of mind, a

4  complaint must allege that the defendants made false or misleading statements either intentionally

5  or with deliberate recklessness." *Zucco Partners*, 552 F.3d at 991 (quotation marks and citation

6  omitted).  "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so

7  provide some reasonable inference of intent, but are not sufficient to establish a strong inference of

8  deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir.

9  2012) (citation omitted).  Accordingly, "a court must consider plausible, nonculpable explanations

10  for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor*

11  *Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  "[A]n inference of scienter must be more than

12  merely plausible or reasonable—it must be cogent and at least as compelling as any opposing

13  inference of nonfraudulent intent." *Id.* at 314.  "The inference that the defendant acted with

14  scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of

15  competing inferences. *Id.* at 324.  "The inquiry . . . is whether *all* of the facts alleged, taken

16  collectively, give rise to a strong inference of scienter, not whether any individual allegation,

17  scrutinized in isolation, meets that standard." *Id.* at 322-23.

18                          **DISCUSSION**

19      The defendants move to dismiss for two reasons:  (i) the plaintiffs fail to plead any

20  actionable misstatements, and (ii) the plaintiffs fail to plead scienter with particularity.  Opp'n 2.

21  Both reasons are valid.

22  **I.      FAILURE TO PLEAD ACTIONABLE STATEMENTS**

23      **A.  The Plaintiffs Do Not Adequately Plead Any False Or Misleading Statements.**

24      "The PSLRA has exacting requirements for pleading 'falsity.'" *Metzler Inv. GMBH v.*

25  *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).  A plaintiff must provide "specific

26  references to specific facts demonstrating that the statements at issue were false or misleading

27  when made." *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1250 (N.D. Cal. 1998) (Whyte, J.).

28  "Moreover, the complaint must allege that the 'true facts' arose *prior* to the allegedly misleading

                                14

United States District Court
Northern District of California

1    statement." *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1072 (N.D. Cal.

2    2001) (Armstrong, J.).

3         The plaintiffs detail in Paragraphs 58 to 61 of the complaint the allegedly false and

4    misleading statements the defendants made and purport to explain why they are false or

5    misleading in Paragraphs 62 to 66.  The defendants argue that the facts alleged by the plaintiffs

6    "do not conflict with the statements that Amyris actually made" and the explanations are not based

7    on "true facts" that arose before when the statements were made.  Mot. 8.  I review these

8    statements in turn.

9                      **1.   April 29, 2011, Press Release**

10        The plaintiffs identify as false and misleading Amyris's April 29, 2011, press release,

11   which stated that "Amyris will operate the [Brazil] production facility and expects to begin

12   Biofene production in May."  Compl. ¶ 58.  The press release continues, "[t]o achieve production

13   at full industrial scale, Amyris has developed an integrated scale-up process which connects

14   ongoing advances in Amyris research with industrial-scale production.  By miniaturizing process

15   conditions found in production-scale fermentors, Amyris has been able to translate yeast

16   performance successfully from discovery to production . . . ."  Opp'n 9 (citing Compl. ¶ 58).  The

17   plaintiffs also point to Melo's statement that "[t]he completion of our first Biofene production

18   facility is a landmark not only for Amyris but also for the renewable products sector . . . . With

19   this milestone, we are demonstrating that engineered yeast may be used to produce high-value

20   hydrocarbon molecules on a commercial scale."  Opp'n 9 (citing Compl. ¶ 58).

21        "These statements," the plaintiffs contend, "were false at the time they were made."  Opp'n

22   9.  By May 2011, "contrary to Defendants' public pronouncements, none of the Company's

23   Biofene production facilities were fully operational," there were technical problems and

24   contamination, and Amyris had conducted "only two or three" test runs of Biofene production,

25   one of which was at the Brazil plant.  Opp'n 9 (citing Compl. ¶ 64).  The plaintiffs claim that "just

26   two days" after Amyris represented that it "developed an integrated scale-up process" which

27   "translated yeast performance successfully from discovery to production," touting the plant as a

28   "landmark" that "could produce on a commercial scale," Opp'n 10 (quoting Compl. ¶ 58), "none

United States District Court
Northern District of California

15

1  of the plants were functioning and the company had performed limited test runs," Opp'n 10.

2  "There was absolutely no basis on which to expect that Amyris could begin actual Biofene

3  Production [sic] in May."  Opp'n 10.

4          The plaintiffs have not adequately pleaded that anything in the press release was false or

5  misleading when made.  While Amyris stated that it "will operate" the production facility and

6  "expects to begin" Biofene production in May, these are merely anticipatory statements and there

7  is nothing in the complaint to suggest that the defendants did not in fact expect production to begin

8  in May or believed that doing so was impossible.  The plaintiffs also do not explain what is false

9  or misleading about the statement that "Amyris has developed an integrated scale-up process

10 which connects ongoing advances . . . with industrial-scale production."  Even if Amyris missed

11 its production targets, the plaintiffs do not allege that Amyris did not actually create a process that

12 can produce at Biofene on an industrial scale.  Nor is there anything particularly untrue or

13 misleading about calling this a "landmark"—this statement is nothing more than "puffery"

14 because it is a "vague, generalized and unspecific" statement that is not actionable under securities

15 law.  *See In re Dura Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006).

16         The plaintiffs argue that these statements are false because "[i]n May of 2011 . . . none of

17 [Amyris's] Biofene production facilities were fully operational" because "they were subject to

18 technical problems, especially the plant in Brazil."  Compl. ¶ 64(a).  Amyris "had conducted 'only

19 two or three' test runs of the Biofene production" as of May 2011.  Compl. ¶ 64(b).  But nothing

20 about these allegations renders false or misleading Amyris's expectation that it "expects" to begin

21 Biofene production in May, nor did Amyris claim that its facilities were "fully operational."

22 Limited or failed test runs are not inconsistent with an expectation of starting production in May.

23 Failed expectations are consistent with having the expectations in the first place without knowing

24 that they would fail.

25         The plaintiffs argue that "[a]s of May 2011, Amyris had still not completed what they

26 claimed to have completed in the April 29, 2011 press release."  Opp'n 10.  But neither defendant

27 claimed that Amyris "completed" anything that guaranteed that it would produce Biofene at the

28

United States District Court
Northern District of California

levels and in the timeframes it projected[4]; all they said was that they developed a process for "industrial" and "commercial" scale production, and that "completion of [Amyris's] first Biofene production facility is a "landmark" and "milestone."  The plaintiffs' burden is to show that these statements were untrue or misleading when they were made.  They have not done so.

### 2.  May 5, 2011 Earnings Call

The plaintiffs identify as false and misleading statements made by the defendants on their May 5, 2011, earnings call with analysts.  In particular, the plaintiffs point to Melo's statement that "[o]ur production outlook remains the same as in the previous guidance we provided – 6 million to 9 million liters of Biofene this year, and 40 million to 50 million liters in 2012 . . . ."  Compl. ¶ 59.  This statement is "false" because the CW allegedly "estimates that among Amyris'[s] scientists, the actual projection was closer to 5 fold lower"—Amyris "would have needed a significant number of factors to go as well or better than they theoretically could" to achieve the projections," and the "technology [would have] to improve at a drastic rate."  Compl. ¶ 65.  Accordingly these statements "were made with "'actual knowledge' that they were false or misleading" because they "were based on nothing more than numbers manipulated to maintain the appearance that Melo's prior promises could still come true."  Opp'n 11.

The plaintiffs have not adequately pleaded that anything said during the earnings call was false or misleading when made.  Melo's statement about Amyris's "production outlook" is precisely that—a production *outlook*.  The defendants did not state that they have produced Biofene at those levels or that there is absolute certainty that those levels will be realized.  "[A]lleging that certain predictions proved incorrect is not the same as alleging with particularity facts that show the initial prediction was a falsehood."  *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1070 (C.D. Cal. 2012) (internal punctuation and citation omitted).  When these statements were made, Amyris had nearly eight more months before definitively learning that it

---

[4] The plaintiffs repeatedly assert in their opposition brief that the defendants "promised" certain production levels of Biofene. *See, e.g.*, Opp'n 3, 9.  But these are the plaintiffs' own words or the words of third parties:  not once in the complaint is either of the defendants alleged to have characterized their own statements as a promise. *See, e.g.*, Compl. ¶¶ 18, 29, 30, 87.  Nor do any of their statements appear to be fairly characterized as such.

1    could not meet its outlook for 2011.  Indeed, production had not even begun yet.  "Although these

2    projections might have been overly optimistic when made, they do not rise to the level of a

3    material misrepresentation actionable" under the securities laws.  *In re Daou Sys.*, 411 F.3d at

4    1021.  As the Ninth Circuit observed, "Honest optimism . . . is not the same as lying or misleading

5    with deliberate recklessness."  *Ronconi*, 253 F.3d at 432.  But the plaintiffs have not adequately

6    alleged that the defendants' projections were dishonest rather than merely "overly optimistic."

7          While the plaintiffs assert that the CW "estimates that among Amyris'[s] scientists, the

8    actual projection was closer to 5 fold lower," there is no allegation that the defendants actually

9    knew this.  But even if the defendants knew this, their statements would not thereby be rendered

10   false or misleading:  though the plaintiffs argue that "[t]aken together, [various] factors made it

11   impossible for Amyris to hit its projections," Opp'n 11, the complaint leaves open the possibility

12   that the projections were achievable if "a significant number of factors [ ] go as well [as] they

13   theoretically could," Compl. ¶ 65(a).  Ultimately, the CW's statement is too equivocal to meet the

14   PSLRA's particularity requirement for pleading because it is unclear what the CW means by

15   saying that he "estimates" this allegation among Amyris's scientists, nor does he say which

16   scientists these are and what the bases for their projections were.  The plaintiffs have not

17   sufficiently pleaded that the defendants knew the outlooks were impossible to achieve and the

18   defendants therefore lied, or the outlooks were so unlikely to be reached that the defendants were

19   deliberately reckless in making their statements.

20         **3.  August 2, 2011, Earnings Call**

21         The plaintiffs identify as false and misleading the defendants' statement that "[i]n our first

22   month of production we delivered 99% of our target production volume and are ramping up

23   quickly.  Our initial start-up went well and without surprises.  Our yeast, our processes and our

24   equipment performed as expected."  Opp'n 11-12 (quoting Compl. ¶ 60).

25         Again, the plaintiffs have not adequately pleaded that anything said during the earnings

26   call was false or misleading when made.  They do not allege that Amyris did *not* deliver 99

27   percent of its target production volume for the first month of production or that it was not

28   "ramping up."  They do not say what expectations Amyris had concerning its yeast, processes, or

United States District Court
Northern District of California

18

1    equipment during the start-up that did not perform as Amyris expected.  The defendants correctly

2    point out that in attempting to explain why this earnings call is false or misleading, the plaintiffs

3    repeat verbatim their explanation for why the May call was misleading.  Mot. 9.  However,

4    repeating allegations related to events occurring earlier in time does not provide "specific facts

5    demonstrating that the statements at issue [concerning this call] were false or misleading when

6    made."  *Wenger*, 2 F. Supp. 2d at 1250.  Simply put, there appears to be nothing actionable about

7    this statement in light of the complaint's allegations.

8         The plaintiffs state, "Tellingly, Defendants again chose to selectively quote the allegations

9    in the Complaint, and ignore the allegations that, ***at the time of this call, the Company knew that***

10   ***roughly 70-80% of the production runs at the Brazil facility had failed***, that the Biomin plant

11   was poorly designed and constructed and that it needed to be retrofit to reduce major problems

12   with crosscontamination by foreign yeast and bacteria."  Opp'n 12 (citing Compl. ¶ 66) (original

13   emphasis).  These facts undermine the defendants' statement that the plant was operating as

14   expected and that "initial start up went well."  Opp'n 12.  Further, because the "first month of

15   production" must have been May 2011, and Amyris was "ramping up quickly," June and July

16   must have been "successful" months as well.  Opp'n 12.  Melo, however, chose to "repeat those

17   false promises" rather than adjust the "prior promised production levels in accordance with the

18   facts on the ground."  Opp'n 12.

19        The plaintiffs mischaracterize the complaint:  the complaint does not allege that Amyris

20   knew "at the time of th[e] call" that 70 to 80 percent of the production runs at the Brazil facility

21   failed.  *See* Compl. ¶ 66(c).  Rather, the complaint states that Amyris "knew that *during the Class*

22   *Period* roughly 70-80% of the production runs at the Brazil facility failed."  Compl. ¶ 66(c)

23   (emphasis added).  This is not the same as alleging that the defendants knew in August—three

24   months into the nine-month class period—that its statements regarding the "first month of

25   production" and "initial startup" were false.  Similarly, although the CW alleges that the Brazil

26   plant "was poorly designed and constructed and [ ] needed to be retrofitted," Compl. ¶ 66(c), there

27   is no allegation about when the defendants knew this such that this knowledge would render their

28   statements during the earnings call false or misleading.  Even if the defendants knew these facts at

United States District Court
Northern District of California

1    the time of the earnings call, the challenged statements are not inconsistent with Amyris's

2    statements because the alleged failure rate and need for retrofitting do not necessarily mean

3    Amyris could not meet its production target for the first month.

4              **B.   Any Forward-Looking Statement Falls Under The Safe Harbor.**

5              "Forward-looking statements" are statements containing projections of financial items,

6    "plans and objectives of management for future operations," "future economic performance," or

7    "assumptions underlying" those predictions.  15 U.S.C. § 77Z-2(i)(1).  The PSLRA contains a safe

8    harbor that eliminates liability for a forward-looking statement if it is "identified as a forward-

9    looking statement, and is accompanied by meaningful cautionary statements identifying important

10   factors that could cause actual results to differ materially from those in the forward-looking

11   statement."  15 U.S.C. § 77z-2(c)(1)(A)(i); *see also* 15 U.S.C. § 78u-5(c)(1)(A)(i).  "Historical

12   statements can also be forward-looking if they are presented as factors underlying a projection or

13   economic forecast."  *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1046 (N.D.

14   Cal. 2007) (Whyte, J.).  "[I]f a forward-looking statement is identified as such and accompanied

15   by meaningful cautionary statements, then the state of mind of the individual making the statement

16   is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter."

17   *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010).

18             "[T]he PSLRA does not require a listing of *all* factors that might make the results different

19   from those forecasted.  Instead, the warning must only mention *important* factors of similar

20   significance to those actually realized."  *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857,

21   882 (N.D. Cal. 2004) (Walker, J.).  "[B]oilerplate language warning that investments are risky or

22   general language not pointing to specific risks is insufficient to constitute a meaningful cautionary

23   warning."  *Id.*  However, a cautionary statement is sufficient even if it identifies important factors

24   by reference to other statements.  *Id.* ("The adequacy of [ ] warnings would also be applicable to

25   the conference calls, since [the defendant] directed listeners to [its] press releases and filings to

26   obtain the relevant cautionary warnings."); *see also Rosenbaum Capital, LLC v. McNulty*, 549 F.

27   Supp. 2d 1185, 1190 (N.D. Cal. 2008) (finding sufficient cautionary statements that reference

28   press releases and SEC filings).  "Whether a statement qualifies for the safe harbor is an

United States District Court
Northern District of California

1    appropriate inquiry on a motion to dismiss." *In re Splash Tech. Holdings*, 160 F. Supp. 2d at 1068

2    (citing 15 U.S.C. § 78u–5(e)).

3         The defendants argue that to the extent that any statement was false or misleading, those

4    statements are predictions about the future that are protected by the PSLRA's safe-harbor

5    provision.  The defendants argue that the statements cited in the complaint "are almost entirely

6    forward-looking."  Mot. 11 (citing Compl. ¶¶ 58-60).  The statements discuss expectations,

7    outlooks, and plans and "contain[ ] predictions about the future."  *In re Accuray, Inc. Sec. Litig.*,

8    757 F. Supp. 2d 936, 947 (N.D. Cal. 2010) (Wilken, J.).  These statements are not actionable

9    because their "truth or falsity of the statement cannot be discerned until some point in time after

10   the statement is made."  *In re LeapFrog Enters.*, 527 F. Supp. 2d at 1046.

11        The plaintiffs argue that the safe harbor does not apply since the defendants' statements

12   "were of historical fact or present events" and the defendants "knew the statements were false at

13   the time they were made."  Opp'n 13.  For example, the April 29, 2011, press release states the

14   following:  "Amyris *has developed* an integrated scale-up process"; "Amyris *has been able to*

15   translate yeast performance"; "The completion of our Biofene production *is a landmark*"; and "*we*

16   *are demonstrating* that engineered yeast . . . ."  Opp'n 13 (quoting Compl. ¶ 58) (plaintiffs'

17   emphases).  Similarly, during the May 5, 2011, earnings call, the defendants made statements like

18   the following:  "Our technical achievements and construction advances reinforced our outlook";

19   "Our outlook for growth is supported by Biomin"; "We installed [two] 200,000 liter fermenters at

20   the facility, which we expect will produce between 2 million and 3 million liters of Biofene this

21   year"; "Our technology, including yield continues to advance"; and "Yield is one of the technical

22   metrics driving a reduction in product costs."  Opp'n 13 (quoting Compl. ¶ 59).  These are not

23   expectations, the plaintiffs argue; they are false statements about present facts.  Finally, during the

24   August 2, 2011, earnings call, Melo made statements such as:  "We have commercial production

25   underway at Biomin"; "Biomin has started up and is producing farnesene"; "In our first month of

26   production we delivered 99% of target production . . . and are ramping up quickly"; "initial start-

27   up went well and without surprises"; and "Our yeast, our processes and our equipment performed

28   as expected."  Opp'n 14 (quoting Compl. ¶ 60).  These, too, constitute statements that the

United States District Court
Northern District of California

defendants "actually knew" was "false when the statements were made," thereby making the safe harbor inapplicable.  Opp'n 14.

Many of the challenged statements are historical, not forward-looking.  But to the extent the challenged statements are historical, they are not false or misleading.  *See generally In re Copper Mountain*, 311 F. Supp. 2d at 880 (finding certain statements to be forward-looking but other statements to be statements of present fact for which the plaintiff failed to plead falsity).  Many of the other challenged statements were addressed earlier in Section I.A. and do not appear to be false or misleading.  And, to the extent the challenged statements are forward-looking, they are accompanied by meaningful cautionary statements.

The forward-looking statements, such as "we expect [to] produce between 2 million and 3 million liters of Biofene this year," fall under the PSLRA's safe harbor.  The press release and the May and August earnings calls were expressly identified as containing forward-looking statements and were accompanied by meaningful cautionary statements.  Each of the earnings calls began with a statement saying that Amyris would provide "certain forward-looking statements about events and circumstances that have not yet occurred."  Ehrlich Decl. Ex. A (Q1 2011 Earnings Call) at 1; Ehrlich Decl. Ex. B (Q2 2011 Earnings Call) at 1; Ehrlich Decl. Ex. Ex. C (Q3 2011 Earnings Call) at 1.  The statement continued, "Actual outcomes and results may differ materially from those contained in these statements due to a number of risks and uncertainties," and listeners were referred to Amyris's SEC filings and were given the SEC's online web address, where the filings were posted.  *Id.*  Similarly, as the complaint itself reflects, the April 29, 2011, press release included a forward-looking-statement warning that the "release contains forward-looking statements . . . regarding future events (such as statements regarding commercial-scale production and commercialization and anticipated benefits of our products)."  Compl. ¶ 58.  It also referred readers to Amyris's 2010 Annual Report on the SEC's Form 10-K.

Amyris's SEC filings warned of the precise risks that underlie the events described in the complaint, namely, Amyris's failure to meet certain projections it made.  Amyris's Form 10-K specifically explained that Amyris might have problems scaling up its production, achieving desired technical results, and meeting production targets.  *See, e.g.*, Ehrlich Decl. Ex. E at 19-24.

For example, the 10-K states, "Our technology may not perform as expected when applied at commercial scale, or we may encounter operational challenges for which we are unable to devise a workable solution. . . . [C]ontamination in the production process could decrease process efficiency, create delays and increase our costs." *Id.* at 20.  In addition, "construction of the [Brazil] facility must be completed on a timely basis and within the budget.  Once the facility is operational, it must perform as we have designed it.  If we encounter . . . engineering problems . . . or other serious challenges in bringing this facility online, we may be unable to produce our initial renewable products in the time frame we have planned . . . ." *Id.* at 22.

Similarly, Amyris's 2011 Q1 Quarterly Report on the SEC's Form 10-Q stated that while Amyris "believe[s it] will be able to sell Biofene into other specialty chemical markets if [it] can attain at commercial production scale the production process efficiencies that [it has] achieved to date, [Amyris] cannot assure [ ] that [it] will be able to do so in the timelines [it] have planned or at all." Ehrlich Decl. Ex. F at 72.  "[Amyris's] ability to produce the volume of Biofene covered by [its] existing agreements is based in part on [its] ability to achieve substantially higher production efficiencies than [it has] to date.  [Amyris] may never achieve those production efficiencies." *Id.* at 74.  These are cautionary statements are sufficient because, "within context," they are both "specific" and "meaningful." *See In re Clorox Co. Sec. Litig.*, 238 F. Supp. 2d 1139, 1142 (N.D. Cal. 2002), *aff'd sub nom. Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125 (9th Cir. 2004).  They go straight to the heart of the plaintiffs' complaints.

While the plaintiffs acknowledge that cautionary statements were given, they argue that the statements were not sufficiently meaningful.  Opp'n 13.  They contend that the defendants "fail to specify how their 'cautionary statements' relate to the specific allegations in the Complaint, but rather, dump a laundry list of statements . . . ."  Opp'n 14.  In addition, the statements in Amyris's Form 10-K were filed months before any of the alleged misstatements in the complaint.  Opp'n 15.  Those statements are not "precise" and do not "directly address" the defendants' projections.  Similarly, citing *Rosenbaum Capital*, 549 F. Supp. 2d at 1191, the plaintiffs assert that the defendants' statements in their Form 10-Q "is not meaningful [because] it warns of risk factors

United States District Court
Northern District of California

United States District Court
Northern District of California

1  that were not merely hypothetical but were in fact occurring."  Opp'n 15.

2        The plaintiffs' arguments are unconvincing.  The defendants do not bear the burden of

3  pairing every statement challenged by the plaintiffs to cautionary statements the defendants made;

4  rather, as the ones bringing the complaint, the plaintiffs bear the burden of showing that they

5  sufficiently plead a cause of action.  The plaintiffs also point to no authority for the proposition

6  that a filing "from months earlier" cannot contain a cautionary statement upon which statements

7  made later may rely.  Opp'n 15.  Indeed, that courts have recognized that SEC filings can serve as

8  cautionary statements by reference indicates that a gap in time between a challenged statement and

9  an applicable cautionary statement does not render the latter ineffective.  In any event, the

10  plaintiffs' critique ignores Amyris's quarterly SEC filings, which coincide in time with each of the

11  earnings calls.

12        Furthermore, as explained above, the statements in Amyris's SEC filings *are* precise and

13  directly address the plaintiffs' complaint:  Amyris explains in its Form 10-K that it may not be

14  able to translate its technology to a commercial scale, that contamination may occur, that

15  production delays may happen, that there might be engineering problems in constructing the

16  plants, and that it might not produce the products in the time frame planned.  *See generally* Ehrlich

17  Decl. Ex. E at 19-24.  These are the exact problems the plaintiffs allege that Amyris experienced

18  but the defendants hid.  Finally, *Rosenbaum Capital* does not help the plaintiffs—as explained

19  above, to the extent that any of the challenged statements discuss present or historical facts, the

20  plaintiffs have failed to show that any of them are false or misleading.

21  **II.      FAILURE TO PLEAD SCIENTER**

22        The defendants argue that the plaintiffs do not plead scienter with particularity.  Because I

23  conclude that the plaintiffs fail to plead any false or misleading statement, the complaint can be

24  dismissed on that ground alone without addressing scienter.  *City of Royal Oak Ret. Sys. v. Juniper*

25  *Networks, Inc.*, 880 F. Supp. 2d 1045, 1068 (N.D. Cal. 2012) (Koh, J.) ("Plaintiffs have not

26  adequately pled that Defendants' long-term projections were actually false or misleading.  Thus, it

27  follows that Plaintiffs have not adequately pled facts from which one can infer that Defendants

28  knew their statements to be false or misleading.").  However, I address scienter for completeness.

24

"[A] plaintiff must provide, in great detail, all the relevant facts forming the basis of [his or her complaint]." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008) (citation omitted). Plaintiffs "must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Id.* at 782 (citation omitted). Recklessness involves "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (citation omitted). A court must approach each case "through a holistic review of the allegations to determine whether they combine to create a strong inference of intentional conduct or deliberate recklessness" without "ignor[ing] the individual allegations and the inferences drawn from them." *In re VeriFone Holdings*, 704 F.3d at 703. "[T]he court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).

**A. Access To Information**

Certain facts are so critical to a business's "core operations" that "their knowledge may be attributed to the company and its key officers." *In re Read-Rite Corp.*, 335 F.3d 843, 848 (9th Cir. 2003). This is called the "core-operations inference." "Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis." *S. Ferry*, 542 F.3d at 784. "Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard. In such cases the inference that defendants had knowledge of the relevant facts will not be much stronger, if at all, than the inference that defendants remained unaware." *Id.* "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Metzler*, 540 F.3d at 1068. On the other hand, "specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements. . . . is sufficient under the PSLRA." *S. Ferry*, 542 F.3d at 785.

"Allegations regarding management's role in a company may be relevant and help to

25

satisfy the PSLRA scienter requirement in three circumstances. First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations. . . . Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information . . . . Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Id.* at 785-86.

The plaintiffs assert that "Defendant Melo[ ] and other members of Amyris management were heavily involved in the day to day operations of Amyris. As such, it is clear that Melo would have been aware of the actual state of data regarding projections for production yield, yet continued to make materially false and misleading statements . . . ." Compl. ¶ 90. The defendants argue that the mere allegation that Melo had access to Amyris's "publishing database" and that management regularly accessed it fails to sufficiently plead scienter. Mot. 16.

Under all three prongs under *South Ferry*, the plaintiffs fail to show that the core-operations inference applies. With regard to the third prong, the plaintiffs have not pleaded that this is the "exceedingly rare" case in which a securities fraud plaintiff may rely solely on the core operations inference without particularized allegations about Melo's access to the relevant information. They have not identified what "relevant *fact* is of such prominence that it would be absurd to suggest" that Melo was unaware of it. *S. Ferry*, 542 F.3d at 786 (emphasis added). The plaintiffs argue that Melo should be "intimately aware of the Company's efforts, ability and current prognosis to commercially produce its signature product" because "[t]he success or failure of the entire company hinged on this point." Opp'n 19. But adopting this standard would eviscerate the core-operations test and turn it into an automatic presumption of comprehensive knowledge on the part of management. To avail themselves of this prong, the plaintiffs must justify their invocation based on more than a mere assertion that all CEOs should want their companies to succeed and therefore ought to know everything about their business.

United States District Court
Northern District of California

1   With regard to the first and second prongs, the plaintiffs' brief provides nothing more than

2   a bare contention that they have met the standard.  Opp'n 19 ("[T]he Complaint alleges with

3   particularity Melo's role and intimate understanding of the effect the failure of the commercial

4   production of Biofene would have on Amyris and more than 'suggest[s] that defendants had actual

5   access to the disputed information . . . . Here, a holistic review of the factual allegations in the

6   Complaint more than supports a strong inference of scienter . . . .").  A review of the complaint

7   likewise reveals that it lacks "detailed and specific allegations" sufficient to show that Melo had

8   actual knowledge that Amyris could not possibly meet its projected volumes.  *See S. Ferry*, 542

9   F.3d at 785.  For example, while the complaint alleges that "CW believes" that Melo "completely

10  ignored [Amyris] scientists' realistic recommendations concerning projections of yield," Compl.

11  ¶ 34, it does not say what the basis for CW's belief is and therefore lacks the necessary specificity.

12  Similarly, the complaint alleges that Amyris's Vice President of Engineering, "who was

13  responsible for reporting scientific findings to the board, including CEO Melo, had unfettered

14  access" to Amyris's scientific database and "Company management regularly 'grabbed' and used'

15  any high yield results," Compl. ¶¶ 39-40, but these claims are insufficient.  As the Ninth Circuit

16  has held, "[g]eneral allegations of [a] defendant['s] . . . interaction with other officers and

17  employees" are insufficient to create a strong inference of scienter.  *In re Daou Sys.*, 411 F.3d at

18  1022.  Additionally, allegations such as that a defendant "could regularly track its sales data" or

19  "tracked [ ] demand using data" "[a]re insufficient to plead scienter under the PSLRA" if the

20  plaintiff cannot allege "hard numbers or other specific information" about what the data showed.

21  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004).

22  The plaintiffs make no allegations about what data or information is in the database Amyris

23  scientists supposedly keep and which should have apprised the defendants of the allegedly false or

24  misleading nature of their statements.  Even taking all the plaintiffs' allegations together does not

25  "raise an inference of scienter that is cogent and compelling, thus strong in light of other

26  explanations" for the defendants' statements, including the most obvious explanation:  that they

27  were simply mistaken in their projections.

28      The plaintiffs cite *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008),

27

United States District Court
Northern District of California

1    in support of their conclusion that the defendants acted with scienter.  There, the plaintiffs sued the

2    defendant company and two of its officers after the company disclosed a 25 percent drop in

3    revenue.  The company's customers were almost all federal agencies.  Two civilian agencies

4    accounted for 80 percent of its revenue, and military agencies comprised the rest; these

5    government customers can, at any time and for any reason, order the company to stop working on

6    existing contracts for up to 90 days.  The *Berson* plaintiffs alleged that the precipitous drop in

7    revenue was caused by four stop-work orders the company received, for which the defendants

8    counted as part of the company's "backlog"—a term the company defines as work it has

9    contracted but has not yet performed.  The plaintiffs claimed that the defendants' doing so misled

10   them into believing that the company was likely to perform work that, in reality, was probably

11   never going to be completed.  The Ninth Circuit noted that the plaintiffs "allege no particular facts

12   indicating that [the officers] actually knew about the stop-work orders."  *Id.* at 987.  Nonetheless,

13   because the officers "were directly responsible for Applied Signal's day-to-day operations . . . it is

14   hard to believe that they would not have known about stop-work orders that allegedly halted tens

15   of millions of dollars of the company's work."  *Id.* at 988.  Accordingly, the facts alleged "support

16   the inference that the backlog statements were misleading when made.  These facts were

17   prominent enough that it would be 'absurd to suggest' that top management was unaware of

18   them."  *Id.* at 989.

19          The plaintiffs also cite *In re MannKind Securities Actions*, 835 F. Supp. 2d 797 (C.D. Cal.

20   2011) in support.  The defendant company, a pharmaceutical producer, made misstatements

21   related to governmental approval of a drug alleged to be "by an overwhelming margin the most

22   important product in the Company."  *Id.* at 814.  Because obtaining approval of the drug "was

23   understood by Defendants to be of paramount importance" and "absolutely integral to the

24   company's success," the court concluded that "it would therefore "be 'absurd' to suggest that

25   management was without knowledge of the matter."  *Id.* at 814-15.

26          Neither of these cases helps the plaintiffs.  Both *Berson* and *In re MannKind Securities*

27   *Actions* involved discrete events that had critical importance to the businesses at issue:  stop-

28   orders for a small number of contracts that affect a huge portion of a company's revenue and

28

United States District Court
Northern District of California

regulatory approval of a company's most important drug.  It makes sense that the companies'

management would or should know the relevant facts about those issues.  The courts reasonably

expected management to be apprised of those matters.  Here, the plaintiffs appear to charge Melo

with knowing whether Amyris would successfully meet its projections or not.  But knowing the

status of a few dispositive factors is very different from knowing whether a still-burgeoning

company as a whole will achieve its goals.  Although Amyris appears to only make Biofene, as the

plaintiffs acknowledge, Amyris would need "a significant number of factors to go [ ] well" in

order for it to meet its projections.  Compl. ¶ 65.  Amyris itself points out in its SEC filings that

the failure of any one factor could have significant consequences for its operations.  It would

therefore be unreasonable to expect Melo to be so aware of all these factors—"a significant

number"—such that his projections for two years would certainly be accurate.  No authority

charges company management with knowledge approaching precognition, and this is not one of

those "rare cases" in which it would be "absurd" for the defendants to be unaware of some fact

critical to their business.

### B.  Trading By Insiders

For stock sales to show scienter, they must be "unusual" or "suspicious."  *Ronconi*, 253

F.3d at 435.  They must be "dramatically out of line with prior trading practices at times calculated

to maximize the personal benefit from undisclosed inside information."  *Id.* (citation and emphasis

omitted).  Factors to consider in determining whether there is evidence of scienter include "(1) the

amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the

sales were consistent with the insider's prior trading history."  *Id.*

The plaintiffs argue that, viewed holistically with other facts alleged, the timing and

amount of Melo's and other executives' stock sales show scienter.  Opp'n 24-25.  The defendants

disagree.[5]

---

[5] The defendants argue that stock sales by non-defendants for whom almost no allegations are made in the complaint are irrelevant to the named defendants' scienter.  *See In re Splash Tech. Holdings*, 160 F. Supp. 2d at 1082 n.22 (finding "no reason" to consider the stock sales of non-parties in determining the scienter of the named defendants).  Because the plaintiffs do not explain how stock sales by non-defendants relate to the issue of whether the defendants acted with scienter, there is no need to consider such stock sales.

With regard to allegedly suspicious stock sales, the complaint only lists the name of the stockholder, the date of particular sales, the number of shares sold, the minimum and maximum price of the stock, and the total value of the shares. Compl. ¶ 92. The plaintiffs do not allege facts, however, to show that any sales were "unusual" or "suspicious." With regard to Melo, they plead no trading history such that they can show that Melo's stock sales are inconsistent with his usual trading patterns. *Zucco Partners*, 552 F.3d at 1005-06. They do not plead the percentage of sales sold by Melo. Nor do they explain how the timing of the sales creates a strong inference of scienter. Without doing so, even when viewed in conjunction with other facts pleaded, the alleged stock sales do not help the plaintiffs.

### C. Confidential Informant

"[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements. First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco Partners*, 552 F.3d at 995 (citations omitted). With regard to the first issue, "Where a complaint relies on both confidential witnesses and other factual information, such as documentary evidence, the plaintiffs need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." *Id.* (quotation marks omitted). However, if "such additional evidence is absent, confidential witness statements may only be relied upon where the confidential witnesses are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.*

As discussed above, there is scant other evidence for believing that the defendants' statements were false. Accordingly, the CW must describe with sufficient particularity that "a person in the position occupied by the source would possess the information alleged." *Id.* To do this, a court may look to "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of

30

United States District Court
Northern District of California

1    the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.*

2        Based on these criteria, the complaint fails to describe with sufficient particularity that a

3    person in the CW's position would possess the information alleged. The plaintiffs identify the

4    CW as a "senior scientist," but do not say when he worked at Amyris. Compl. ¶ 31. Contrary to

5    the plaintiff's assertion that "the Complaint makes clear that CW's employment coincided with the

6    Class Period in general and, specifically, during the critical 2011 time period when the actionable

7    statements were made," Opp'n 21, the complaint does no such thing, whether by implication or

8    with particularity, as a complaint alleging securities fraud must. The plaintiffs' allegation that CW

9    worked "in bio separations and process development, a group that, among other things, developed

10   a process for the recovery and isolation of farnesene from saccharomyces broth," Compl. ¶ 31, is

11   also insufficient to explain how the CW has personal knowledge of the allegations he makes. It

12   describes what the group does, but not what the CW does or what his responsibilities at Amyris

13   are. The complaint does not detail who the CW works with and what sources of information are

14   available to him. Although the CW allegedly reports to Amyris's Vice President of Engineering,

15   that still does not establish a basis for personal knowledge of all the facts he alleges and,

16   ultimately, scienter on the part of the defendants when their challenged statements were made. In

17   sum, the CW does not explain the bases for his knowledge. Since there is no other corroboration

18   to support CW's allegations, his claims do not appear to be based on personal knowledge and are

19   not reliable.[6]

20       For example, the plaintiffs say that according to CW, "estimates by Amyris scientists were

21   that the Company's capability to produce commercial Biofene was roughly 'five fold lower' than

22

23   ─────────────────

24   [6] Even if there was other factual information providing an adequate basis for believing that the
     defendants' statements were false, the information about the CW and the allegations the CW
     makes are too vague and unsupported to show a strong inference of scienter on the part of the
25   defendants. A complaint must "state with particularity all facts on which that belief is formed."
     15 U.S.C. § 78u-4(b)(1)(B). However, the plaintiffs do not state with particularity the basis for the
26   CW's belief that Amyris's management "was aware that it would not be able to translate peak
     yields of Biofene, produced in lab settings, to stable and reliable production at factory scale."
27   Compl. ¶ 32. Nor do they state with particularity the basis for the CW's belief that "Amyris
     management, including CEO John Melo[,] either completely ignored its scientists' realistic
     recommendations concerning projections of yield, or cherry picked the very best available
28   data . . . ." Compl. ¶ 34. These are nothing but unsupported assertions and are not credible.

31

what the Company was publicly projecting." Opp'n 21 (quoting Compl. ¶ 31). This statement is ambiguous because it is unclear whether CW has "personal knowledge" of these estimates. *Zucco Partners*, 552 F.3d at 995. Even if he does, this allegation lacks the "level of detail" necessary because it is unaccompanied by other facts of a "corroborative nature." *Id.* Further, the plaintiffs allege that "CW believes that the Company's management was aware that it would not be able to translate peak yields of Biofene, produced in lab settings, to stable and reliable production at factory scale" and "CW believes that Amyris management, including CEO John Melo either completely ignored its scientists' realistic recommendations concerning projections of yield, or cherry picked the very best available data from tests at every step of the process . . . ." Compl. ¶¶ 32, 34. But they do not "provide an adequate basis" for CW's beliefs, which are otherwise conclusory, and "conclusory allegations . . . are not sufficient to raise a strong inference of scienter because they demonstrate that the confidential witnesses are not reliable." *Zucco Partners*, 552 F.3d at 995-96.

The plaintiffs argue that in *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1072 (C.D. Cal. 2012), the court found allegations by a confidential witness sufficient where the witness's title, team, and supervisor were identified. Opp'n 21. They assert that they have pleaded as much here. But in *Gammel*, the plaintiffs plead much more specific details than the plaintiffs here provide. For the four confidential witnesses there, the plaintiffs provided very specific titles, such as "Vice President of Marketing and Strategy in the Solution Partners Organization of PSG" and "Senior Vice President of Hardware Engineering in the Palm GBU." They also provided, to the month, the witnesses' dates of employment. While the CW here alleges that he reported to Amyris's Vice President of Engineering, other facts about him are lacking. In any event, the standard applied in *Gammel* is only the "minimum" standard for establishing a confidential witness's reliability. The *Gammel* court explains, meeting "minimum reliability standards doesn't mean that *every* statement offered by these witnesses must be accepted as true. In certain circumstances, the Court may disregard confidential witness statements that are speculative, lack specificity, or are not based on personal knowledge." *Id.* at 1073. In addition, the court notes that the statements must still be indicative of falsity or scienter, and that the

32

United States District Court
Northern District of California

1    witness's statements may be unreliable to the extent that they rely on hearsay.  *Id.*  Even if I found

2    the CW reliable, for the reasons detailed earlier, I do not find that his assertions must be accepted

3    as true in light of the fact that they appear "speculative," unspecific, and "not based on personal

4    knowledge."

5        **D. Consultants**

6        "There is authority for the proposition that a plaintiff in a securities fraud action controlled

7    by the requirements of the PSLRA can support its allegations of falsity with facts provided by an

8    expert."  *In re Silicon Storage Tech., Inc., Sec. Litig.*, No. 05-cv-295-PJH, 2007 WL 760535, at

9    *30 (N.D. Cal. Mar. 9, 2007).  "[S]uch factual allegations are subject to the same standard applied

10   to evaluate facts alleged to have originated with any 'confidential informant.'"  *Id.*

11       The defendants argue that the opinions of two anonymous consultants cited by the

12   plaintiffs "are either completely irrelevant, or in fact support Defendants' position."  Mot. 21.

13   Applying the two-part test for confidential informants, the defendants argue that the unidentified

14   "consultants" are not alleged to have any personal knowledge of the defendants' scienter.  Mot.

15   21-22.  The defendants also assert that the plaintiffs' statement that the consultants' opinions were

16   based on Amyris's public filings and statements "completely undermine Plaintiffs' argument that

17   the alleged statements were actionable:  if anyone could simply look at public information and

18   determine that Amyris would have difficulty reaching its future projections, then the projections

19   cannot be misrepresentations meant to mislead investors.  Mot. 22.  The consultants here are

20   improperly conducting "an after-the-fact analysis to determine what Amyris should have known."

21   Reply 13.

22       The plaintiffs assert that they "have adequately set forth [the consultants'] qualifications to

23   address the issues in this matter."  Opp'n 22-23 (citing Compl. ¶ 70-72).  Though the consultants

24   rely only on public information, they "used the information disclosed at the end of and after the

25   Class Period in reaching their conclusions" that the defendants "could not have reasonably

26   believed that [Amyris] would meet its projected levels of biofuel production."  Opp'n 23.

27       I need not decide whether the consultants here have met the minimum standards for

28   reliability because, even if they did, I do not find that their opinions support a strong inference of

33

scienter on the part of the defendants. The plaintiffs proffer the consultants' opinion about "why Amyris could not have reasonably believed its statements about its ability to generate biofuel at the levels it publically projected." Compl. ¶ 44. They further allege, "It is thus clear that based on what was known at the time, Amyris'[s] projections were unreasonable." Compl. ¶ 80. The issue, however, is whether the defendants acted with scienter when the challenged statements were made. While the consultants say that the defendants made "[m]isjudgment[s]" and "could not have reasonably projected the publically stated projections for production in biofuels," Compl. ¶ 81, nowhere do they provide any facts to show that the defendants knowingly or with reckless disregard made false or misleading statements. The consultants point to a number of items about which Amyris could have done better, but nowhere do they point to evidence that the defendants acted with the necessary culpability to establish securities fraud.

### E. Post-Class Period Statements

The plaintiffs cite to an August 2012 news article and a 2013 video as evidence of scienter. Compl. ¶¶ 77, 87-88. Asserting that "a post-class statement may form the basis for scienter," the plaintiffs point to Melo's "admission" that "[t]he regret is not realizing how hard it was to get the scale up." Opp'n 23 (quoting Compl. ¶ 87). This, they argue, "is inconsistent with the statements made in both the April 20, 2011 press release and the May 5, 2011 earnings call." Opp'n 23. In particular, "the statement directly contradicts the statements made by Melo in the August 2, 2011 earnings call" during which Melo stated that Amyris delivered 99 percent of its production volume and was ramping up quickly. Opp'n 23. Further, the plaintiffs allege that Amyris "admitted that its earlier projections were unattainable" in July 2013, and said that it is just now "optimizing their first generation conversion processes" and that "[t]here are still many steps to make before getting there, [b]ut large scale conversion of biomass into renewable energy is underway." Opp'n 24 (quoting Compl. ¶ 87).

There is nothing supporting a strong inference of scienter in the statements made after the class period. In the August 8, 2012, article cited, Amyris's chief technology officer, Neil Renninger, is merely quoted as saying that Amyris was "chasing that number" projected by Melo. Compl. ¶ 87. The article continues, "'The regret is not realizing how hard it was to get the scale

34

up,' says Melo now."  Compl. ¶ 87.  But there is nothing here that shows that the defendants acted with scienter.  All Renninger's statement shows is that Amyris was working hard to achieve its projections and all Melo's statement shows is that he did not realize how difficult his projections were to achieve.  "The question is whether th[e challenged] statement [ ] is a statement similar to 'I knew it all along,' establishing the falsity of an earlier statement by means of a later statement by the defendant."  *Yourish v. Cal. Amplifier*, 191 F.3d 983, 996 (9th Cir. 1999).  Acknowledging that Amyris had more trouble scaling up its process than anticipated does not show that the defendants always knew that the projections were unattainable or that they acted with scienter because "it is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood."  *Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999) (internal punctuation and citation omitted).  Renninger's and Melo's statements are equally consistent with their *not* acting with scienter.

## III.      FAILURE TO SHOW CONTROL PERSON LIABILITY

Because the plaintiffs do not adequately allege a primary violation under Section 10(b), their Section 20(a) claim for control person liability must also be dismissed.  *Zucco Partners*, 552 F.3d at 990; *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) ("[T]o prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must first allege a violation of § 10(b) or Rule 10b[-]5.").

1

**CONCLUSION**

2        To successfully state a claim, the plaintiffs must plead with particularity what statements

3   were made, when they were made, why they were false at the time they were made, and how the

4   defendant who made the statement acted with scienter at the time the statements were made.

5   Because the plaintiffs fail to adequately plead that the defendants made any false or misleading

6   statements and that they did so with scienter, the motion to dismiss is GRANTED WITH LEAVE

7   TO AMEND.  Any amended complaint shall be filed within 30 days from the date of this Order.

8        **IT IS SO ORDERED.**

9   Dated: March 24, 2014

10   _____

11   WILLIAM H. ORRICK
     United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

36